IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| PHILIP J. INSINGA, | |
| Plaintiff, | 8:17CV179 |
| vs. | |
| UNITED OF OMAHA LIFE INSURANCE COMPANY, | MEMORANDUM AND ORDER |
| Defendant. | |

This matter is before the Court on defendant United of Omaha Life Insurance Company's ("United") Motion to Dismiss (Filing No. 21) pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the Motion is granted and the case is dismissed for failure to state a claim.

I.  BACKGROUND

The Court normally presents "the facts as asserted in [the] complaint and in the light most favorable to" the plaintiff. *Key Med. Supply, Inc. v. Burwell*, 764 F.3d 955, 959 (8th Cir. 2014). However, "when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *Northern Ind. Gun & Outdoor Shows v. City of S. Bend*, 163 F.3d 449, 454 (7th Cir. 1998). The Contract at issue was attached to the Complaint and, along with the Complaint, constitutes the factual basis on which the Court relies.

Plaintiff Philip J. Insinga ("Insinga") was a participant in the Safe Auto Insurance Company 401(k) Plan ("Plan"). The Plan was both an employee pension benefit plan and an individual account plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § *et seq*. The Plan negotiated a contract ("Contract") with United

to provide various investment services for the employees. The parties agree the Contract is an asset of the Plan.

Under the Contract, the Plan[1] has the option to invest in three different accounts: (1) a Holding Account, used for temporary investment, (2) a Maturity Account, where contributions are held for a fixed period of time, and (3) Separate Account K, which includes various Subaccounts including mutual funds, securities, and other funds over which United has no control. Holding Accounts and Maturity Accounts are held as part of United's general assets. The Maturity Account is at issue in this case.

Section 2.07 of the Contract explains the operation of Maturity Accounts. At least once a month, United declares a Guaranteed Interest Rate for any contributions directed to a Maturity Account. The Guaranteed Interest Rate is declared before contributions are made. Once any contributions are received, the Guaranteed Interest Rate and Maturity Date are locked in and "continue in effect until the Maturity Account is terminated and all funds are transferred or withdrawn from it." Each Maturity Account has "a Maturity Account Term equal to [five] consecutive twelve month periods . . . beginning as of the first day of the month in which contributions are received." No minimum Guaranteed Interest rate is required, and United has gradually reduced the interest rate from above one-percent to below one-percent.

Maturity Accounts are subject to various penalties if funds are withdrawn before the Maturity Date. Participants are also restricted in their ability to transfer funds out of the Maturity Account into different investment options. The restrictions include a ninety-day "equity wash"[2] for any transfers to a Competing Fund and United's right to restrict

---

[1] The Contract allows the Plan to invest in the different accounts. According to the Complaint, Insinga directed the Plan where to invest his assets. Thus, the Plan's investment decisions are controlled by the individual wishes of the Plan participants.

[2] An equity wash requires a transfer from the Maturity Account to a competing fund to be held for at least ninety days in a non-competing investment option.

transfers that appear to be engaging in market timing or are of an "unusual volume." After the Maturity Date, funds are automatically reinvested into the current Maturity Account with its own Guaranteed Interest Rate unless notice is given by the Plan.

United may limit the contributions to a Maturity Account to $50,000, and, if more than that is invested, add those excess funds to "a new Maturity Account with the same Maturity Date and a Guaranteed Interest Rate declared by United based on current rates." The Contract also provides, "If requested by the Contractholder and agreed to in writing by United, additional Maturity Accounts . . . ranging from two (2) to five (5) years will be established at United's then-current Guaranteed Interest Rates."

United guarantees the principal in the Maturity Account as well as the Guaranteed Interest Rate. The difference between the Guaranteed Interest Rate and the return that United actually earns on the funds in the Maturity Account ("spread") is kept by United as its compensation. United also charges an administrative fee of fifteen basis points on the balance invested in the Guaranteed Account.

## II.   DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In his Complaint, Insinga presents three claims. Claim I states that United breached its fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1) by setting the Guaranteed Interest Rate for United's benefit, retaining the spread, and charging excessive fees. Claim II alleges United engaged in transactions for its own benefit in violation of 29 U.S.C. § 1106(b). Claim III asserts United engaged in prohibited transactions in its capacity as a party-in-interest under 29 U.S.C. § 1106(a)(1)(C).

## A. Claims I and II

In Claims I and II, Insinga claims United breached its fiduciary duty by engaging in various transactions prohibited to fiduciaries. Insinga bases his allegation that United is a fiduciary on (1) United's alleged discretionary authority over the Contract and (2) United's ability to set its own compensation. United claims it is not a fiduciary under ERISA.

### 1. United's Discretionary Authority over the Contract

"Because [United] is not a named fiduciary of the plan, [Insinga] need[s] to plead facts demonstrating that Principal acted as a fiduciary 'when taking the action subject to complaint.'" *McCaffree Fin. Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1002 (8th Cir. 2016) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)).

Under ERISA, "a person is a fiduciary with respect to a plan to the extent . . . he exercises any discretionary authority or discretionary control . . . respecting management or disposition of its assets."[3] 29 U.S.C. § 1002(21)(A). "When a contract . . . grants an insurer discretionary authority, even though the contract itself is the product of an arm's length bargain, the [service provider] may be a fiduciary." *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 737 (7th Cir. 1986). This is because the "ability to amend [a contract], and thereby alter its value, is not qualitatively different from the ability to choose investments." *Chicago Bd. Options Exch., Inc. v. Conn. General Life Ins. Co.*, 713 F.2d 254, 260 (7th Cir. 1983).

"However, "if a specific [contract] term (not a grant of power to change terms) is bargained for at arm's length, adherence to that term is not a breach of fiduciary duty." *Miniat*, 805 F.2d at 737. The Eighth Circuit has followed the reasoning of the Seventh

---

[3]In addition to the plaintiff showing the defendant to be a fiduciary of the plan, fiduciary claims under ERISA require "a 'nexus' between the alleged basis for fiduciary responsibility and the wrongdoing alleged in the complaint." *McCaffree*, 811 F.3d at 1002 (quoting *Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co.*, 768 F.3d 284, 296 (3d Cir. 2014)).

4

Circuit, declaring "a service provider's adherence to its agreement with a plan administrator does not implicate any fiduciary duty where the parties negotiated and agreed to the terms of that agreement in an arm's-length bargaining process." *McCaffree*, 811 F.3d at 1003.

Insinga claims that United has discretion over the Contract, and, because the Contract is a Plan asset, United has discretion over Plan assets. Insinga points to two provisions as the source of United's alleged discretion: (1) United's ability to declare the Guaranteed Interest Rate monthly, and (2) United's ability to close a Maturity Account to new contributions and open a new one with a different Guaranteed Interest Rate.[4]

### a. United's Monthly Declaration of the Interest Rate

Insinga argues that United's ability to declare a new Guaranteed Interest Rate every month amounts to "a grant of power to change terms" and constitutes discretion over the Contract. *See Chicago Bd.*, 713 F.2d at 260. United disagrees, labeling its declaration of the new interest rate as merely a term of the Contract. The parties agree the Contract was the result of an arm's-length bargain. Thus, the question is whether United's monthly declaration of the new Guaranteed Interest Rate is merely a term of the Contract or the discretionary ability to change the terms of the Contract.

The Court concludes that United does not change the terms of the Contract when it declares a new Guaranteed Interest Rate every month. The Plan entered into the Contract to gain, among other options, the chance to invest money into an account where the interest is guaranteed. The Plan received that exact benefit. The interest rate is declared before any investments into a Maturity Account are made by the Plan. If the Plan determines that the declared interest rate is too low, it has full discretion to invest in a different fund. The appropriate amount of interest to guarantee is a fact-intensive

---

[4]Insinga does not argue that United's assets are also assets of the Plan, and both parties agree the guaranteed-benefit-policy exception does not apply. 29 U.S.C. § 1101(b)(2).

question requiring careful monitoring of the current state of the market. Because of the market's constant fluctuations, fixing an exact interest rate or methodology into the terms of a contract would be almost impossible.

If Insinga is unhappy with the investment options that his Plan has contracted to provide, those complaints are more appropriately addressed to the Plan. United setting the Guaranteed Interest Rate did not change the Contract, nor did United exercise any other ability to change the contractual terms here.[5] Simply put, United does not become a fiduciary by declaring the monthly Guaranteed Interest Rate.

### b. United's Ability to Close Contributions

Section 2.05 of the Contract, labeled "Contribution Limits," states:

> United reserves the right to limit the maximum amount of Contributions directed to any Maturity Account of this Contract to no more than $50,000.00. Contributions exceeding this amount will be invested in a new Maturity Account with the same Maturity Date and a Guaranteed Interest Rate declared by United based on current rates."

Insinga claims that this provision gives United discretion to set the Guaranteed Interest Rate after a contribution is made for any contributions over $50,000. United maintains that the phrase "based on current rates" means that the new Maturity Account must have the same interest rate.

Even if Insinga's interpretation is correct, ERISA requires that a person exercise discretionary authority, not merely possess it. 29 U.S.C. § 1002(21)(a). Insinga fails to allege that United ever limited the maximum amount of contributions and invested the excess in a new Maturity Account with a different Guaranteed Interest Rate. Insinga

---

[5]United was granted the unilateral authority to amend the frequency of declaring the Guaranteed Interest Rate and change the administrative fee, both requiring thirty-days' notice to the Plan. United also retained the right to terminate the Contract or not accept additional contributions, both requiring sixty-days' notice and neither of which would affect established accounts. Insinga does not allege United exercised that authority.

6

would also need to allege that those actions resulted in its alleged injury. *McCaffree*, 811 at 1002 ("[Plaintiff] needed to plead facts demonstrating that [defendant] acted as a fiduciary 'when taking the action subject to complaint.'"). Section 2.05 of the Contract does not make United a fiduciary.

### 2. United's Discretion to Set its own Compensation

Because United retains the spread as part of its compensation, Insinga claims that United can set its own compensation by varying the Guaranteed Interest Rate. Insinga points to case law from the Second, Fifth, and Sixth Circuits as support for the claim that a service provider who can set its own compensation is an ERISA fiduciary.

In *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259 (2nd Cir. 1987), the Second Circuit explained that "after a person has entered into an agreement with an ERISA-covered plan, the agreement may give it such control over factors that determine the actual amount of its compensation that the person thereby becomes an ERISA fiduciary with respect to that compensation." The court explained that when compensation was based on a percentage of claims paid by an insurance company, and the insurance company had complete control over which claims to pay, then the insurance company was a fiduciary with respect to that compensation. *Id*.

The Fifth Circuit determined that an individual had control over his own compensation when he owned the companies that (1) consulted a fund, (2) operated as the fund's claims administrator, and (3) acted as the regional manager for the insurance company that sold insurance to the fund. *Reich v. Lancaster*, 55 F.3d 1034, 1040, 1049 (5th Cir. 1995).

The Sixth Circuit decided an entity exercised discretion over its compensation when it unilaterally chose to impose a fee on services for a two-year period before ending its collection of the fee. *Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*, 722 F.3d 861, 864-67 (6th Cir. 2013).

Those cases are factually distinguishable because, here, the connection between the Guaranteed Interest Rate and United's compensation is too attenuated as to give United discretion over its compensation. If United sets a lower interest rate, fewer members will presumably choose to invest in the Maturity Account as opposed to other options with a more attractive rate. Ultimately, the Plan and its participants determine how much investment is made in the Guaranteed Account. Additionally, United has no mechanism for controlling the market rate of return. Because its compensation is largely controlled by the Plan's choices and other factors outside United's control, United is not setting its own compensation in the same way as the entities in the cases cited by Insigna. The effect of the Guaranteed Interest Rate on United's compensation does not make it a fiduciary.

Because United is not a fiduciary, it cannot have breached its fiduciary duties or have engaged in transactions prohibited to a fiduciary. Claims I and II are therefore dismissed for failure to state a claim.

### B. Claim III

In Claim III, Insinga alleges in the alternative that United was a party-in-interest and engaged in improper transactions between a Plan and a party-in-interest.[6] 29 U.S.C. § 1106(a)(1)(C) and (D). Insinga seeks the profits that United received from the allegedly prohibited actions, pointing to the portion of ERISA that provides for "other appropriate equitable relief." *Id*. § 1132(a)(3). United argues that "appropriate equitable relief" does not include the profits that Insinga desires, and, as a result, Insinga does not state an adequate claim for relief.

Both parties agree that suits that seek monetary relief are typically categorized as suits for money damages. *See*, *e.g.*, *Great-West Life & Annuity Ins. Co. v. Knudson*, 534

---

[6]Insinga alternatively claims liability for these dealings due to United's status as a fiduciary. As determined earlier, United is not a fiduciary.

U.S. 204, 210 (2002). The parties also appear to agree the money Insinga seeks is commingled among United's general funds and is not traceable to a res or particular funds. Insinga categorizes his requested relief as the equitable remedy of disgorgement of ill-gotten gains, also known as an accounting for profits. Insinga relies on *Knudson*, wherein the Supreme Court declared accounting for profits to be an equitable remedy available even when the requested funds cannot be traceable to a res or particular funds. 534 U.S. at 214 n.2.

An accounting for profits first requires "a plaintiff [to be] entitled to a constructive trust on particular property held by the defendant." *Id.* The remedy allows a plaintiff to "recover profits produced by the defendant's use of [the particular property in the constructive trust], even if [the plaintiff] cannot identify a particular res containing the profits sought to be recovered." *Id.* The Eighth Circuit has subsequently explained that "[t]he plaintiff must specifically identify the particular funds or property in order to obtain the constructive trust; it is not enough that the defendant merely owes the plaintiff some money." *Knieriem v. Grp. Health Plan, Inc.*, 434 F.3d 1058, 1064 (8th Cir. 2006) (quoting *Parke v. First Reliance Std. Life Ins. Co.*, 368 F.3d 999, 1008 (8th Cir. 2004)).

There are two exceptions to the requirement that a plaintiff must identify a res and obtain a constructive trust, neither of which applies here. The first exception applies to fiduciaries that breach their duties. *Parke*, 368 F.3d at 1009-10. Because United cannot be a fiduciary if it is solely a party-in-interest, and because the Court has determined United does not qualify as a fiduciary under ERISA, Insinga cannot use this exception.

The second exception applies in securities-fraud cases. *SEC v. Quan*, 817 F.3d 583, 594 (8th Cir. 2016). In those cases, "the SEC seeking disgorgement is not analogous to a private plaintiff suing for money it is owed under a contract" because the funds are paid to the district court. *Id.* This exception does not apply here.

Because Insinga cannot identify the res or particular property to establish a constructive trust, it cannot claim the equitable remedy of an accounting for profits. It is unnecessary to reach the other issues raised by United, such as whether Insinga correctly pled in the alternative or whether United qualifies as a party-in-interest. Count III is dismissed.

### III. CONCLUSION

United is not a fiduciary of the Plan under ERISA and cannot be liable for breach of fiduciary duty or for engaging in transactions prohibited to fiduciaries. Without determining whether United is a party-in-interest, it is clear the relief that Insinga seeks for Count III is not appropriate equitable relief. Accordingly,

IT IS ORDERED:
1. United of Omaha Life Insurance Company's Motion to Dismiss (Filing No. 21) is granted.
2. The case is dismissed without prejudice.

Dated this 26th day of October, 2017.

BY THE COURT:

s/ *Robert F. Rossiter, Jr.*
United States District Judge